UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                                       :
INA GROVE                                              :          3:20 CV 00549 (RMS)
                                                       :
V.                                                     :
                                                       :
ANDREW M. SAUL, COMMISSIONER                           :
OF SOCIAL SECURITY                                     :          DATE: AUGUST 17, 2021
                                                       :
------------------------------------------------------ x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION
OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ("SSA") denying the plaintiff disability insurance benefits ("DIB"), Widow's Benefits,[1] and Supplemental Security Income ("SSI").

I.     ADMINISTRATIVE PROCEEDINGS

The plaintiff filed her initial claim for DIB and SSI on July 14, 2015, claiming that she had been disabled since March 23, 2012, due to spinal stenosis, lumbar stenosis, degenerative osteoarthritis, cervical spurring, lumbar spurring, uncovertebral arthritis, severe disc space narrowing, levoscoliosis, depression, and anxiety. (Certified Transcript of Administrative Proceedings ["Tr."] 136-37, 273). The plaintiff's application was denied initially on May 18, 2016 (Tr. 148-49, 268), and upon reconsideration on August 16, 2016. (Tr. 194).

---

[1] During the plaintiff's January 8, 2019 Social Security Disability hearing, the presiding Administrative Law Judge stated that the plaintiff had missed the period of eligibility for Widow's Benefits, which ended November 30, 2014. (Tr. 50).

On August 24, 2016, the plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 313), and on November 28, 2017, a hearing was held before ALJ John Noel, at which the plaintiff and a vocational expert, Courtney Olds, testified. (Tr. 92, 124, 1576-1606). The ALJ subsequently issued an unfavorable decision on March 28, 2018, denying the plaintiff's claims for benefits. (Tr. 226-38). On April 13, 2018, the plaintiff submitted a request for review of the hearing decision, and on July 25, 2018, the Appeals Council granted the plaintiff's request for review, vacated the ALJ's March 28, 2018 decision, and remanded the matter for resolution. (Tr. 419, 263-65). Specifically, the Appeals Council determined that the hearing decision did not "contain an adequate evaluation" of one of the plaintiff's nontreating source opinions because the exhibit was incomplete and, accordingly, remanded the case for the ALJ to further evaluate the plaintiff's mental impairments. (Tr. 263-64).

A second hearing was held before ALJ Noel on January 8, 2019, at which the plaintiff and a vocational expert, Larry Takki, testified. (Tr. 48-90). The ALJ issued a decision on April 3, 2019, denying the plaintiff's claims for benefits. (Tr. 22-34). On May 28, 2019, the plaintiff requested review of the hearing decision, and on March 16, 2020, the Appeals Council denied that request (Tr. 1-11), thereby rendering the ALJ's decision the final decision of the Commissioner.

On April 23, 2020, the plaintiff filed her complaint in this pending action, (Doc. No. 1)[2] and on September 9, 2020, the defendant filed his answer and administrative transcripts. (Doc. No. 15). On May 28, 2020, the parties consented to the jurisdiction of a United States Magistrate Judge and the case was transferred to the undersigned. (Doc. No. 10). On November 10, 2020, the plaintiff filed her Motion to Reverse the Decision of the Commissioner, wherein she included a statement of material facts, (Doc. Nos. 17, 17-2) and on January 11, 2021, the defendant filed his

---

[2] On the same day, the plaintiff filed a Motion for Leave to Proceed *In Forma Pauperis* (Doc. No. 2), which the Court granted. (*See* Doc. No. 3).

Motion to Affirm, along with a responsive statement of facts. (Doc. Nos. 18, 18-2). Although the defendant adopted many of the plaintiff's representations, he included several additional statements of fact. (*See* Doc. No. 18-2 at 1-8).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 17) is granted in part and denied in part and the defendant's Motion to Affirm (Doc. No. 18) is denied.

II.    FACTUAL BACKGROUND

   A.    HEARING TESTIMONY

On the date of her second hearing, the plaintiff was living with her sister in a three-story apartment owned by her aunt where the plaintiff occupied the third floor and her aunt, before moving to a nursing home, occupied the first floor. (Tr. 54-55, 112-15). The plaintiff is a high school graduate and does not have any college degrees. (Tr. 98). The plaintiff also has two grown children, neither of whom she sees often because they do not live in Connecticut. (Tr. 98-109). The plaintiff testified that her last job was as an identity fraud specialist with Citibank, where she worked at a call center from 2005-2012. (Tr. 55-57, 99). The plaintiff testified further that she was terminated from that job because of her inconsistent work hours stemming from her ailments, and because her prescribed medications were affecting adversely her ability to work effectively at the rapid pace required of her. (Tr. 70-72).

The plaintiff testified that the pain in her cervical spine was "constant burning," which made repetitive movements excruciatingly painful to the point that she would be brought to tears. (Tr. 100-101). Specifically, the plaintiff testified that having to remain sedentary at work "for any length of time" was difficult because she did not "have a disc between L4 and L5" and the constant pressure on her lumbar region would require her frequently to switch positions in her seat or walk

around to alleviate the pain. (Tr. 57, 101). The plaintiff testified further that her neck was constantly burning at a pain level of "maybe seven or eight," which, when coupled with the back pain, significantly limited her ability to, among other things, drive, cook, sleep, and walk. (Tr. 58-60). As a result of her physical limitations, the plaintiff testified that she would only leave the house to do her grocery shopping, which presented its own challenges such as driving and carrying the groceries up three flights of stairs. (Tr. 61, 106).

In addition to her back and neck pain, the plaintiff testified that her depression prevented her from working. (Tr. 62). Specifically, the plaintiff noted that there were times where she would have to leave her workstation to avoid crying in public because a bad phone call with an upset client would trigger her PTSD and anxiety. (Tr. 62). Additionally, the plaintiff testified that the stressful environment at work caused her to have panic attacks "full of anxiety." (Tr. 73). The plaintiff testified further that it would take her about 30 minutes to get her heart to stop racing after a panic attack, but the lingering mental unrest could last up to a couple of days. (Tr. 74-75).

The vocational expert testified that a person with the plaintiff's past work experience, who was capable of "medium work" with occasional climbing ramps and stairs, ladders, ropes, and scaffolds, with occasional balancing, stooping, kneeling, crouching and crawling could perform the plaintiff's past work.  (Tr. 83-84).  If an individual had the same exertional limitations, and was limited to simple, routine tasks involving judgment limited to simple work-related decisions with routine changes in the work setting and having only occasional contact with the public, such an individual could not perform the plaintiff's past work. (Tr. 85).  Such a person could, however, perform the work of sub-assembler of electronics, a routing clerk, and a price marker, which are unskilled jobs that are repetitive in nature and require no more than occasional standing from a seated position. (*Id.*). Such jobs, however, would be precluded for an individual who was off task

4

ten percent of the time on an ongoing basis or for someone who regularly missed more than one day of work each month. (Tr. 86). The vocational expert also testified that the plaintiff's past work could be done with a sit/stand option, "as these workstations are showing up more and more as the primary installation in these offices . . . a sit/stand option is not unusual to see in many call centers." (Tr. 87).

B.   UNDERLINE MEDICAL HISTORY

On November 1, 2012, the plaintiff visited Summit Physician Services where she presented with chronic back pain. (Tr. 655). During her visit, Dr. Michael Patti observed that the plaintiff showed "distress with movement" but, notwithstanding, the plaintiff was able to spin from a position where her legs were over the arm of her chair to a forward sitting position without any obvious pain. (*Id.*). Dr. Patti diagnosed the plaintiff as having chronic pain syndrome. (Tr. 656). In a subsequent visit on November 21, 2012, the plaintiff presented with depression. (Tr. 653). Dr. Patti recorded that the plaintiff had been off her anxiety and depression medications for months. (*Id.*). The plaintiff reported feeling "worse compared to last visit" and reported having low energy, fatigue, and difficulty concentrating. (*Id.*). The plaintiff reported further that she had been struck with the news of her mother's recent hospitalization and expressed anxiety over her worsening financial situation and inability to pay rent. (*Id.*). Dr. Patti diagnosed the plaintiff with depressive disorder, anxiety, and chronic pain syndrome. (Tr. 652).

On January 9, 2013, the plaintiff again presented with back pain after twisting awkwardly in the shower. (Tr. 650). Dr. Patti noted that she had two back operations in 2011 stemming from a herniated disc. (*Id.*). The plaintiff rated her pain severity as a six out of ten at the least and an eight out of ten in severity at its worst. (*Id.*). Dr. Patti noted further that the plaintiff's depression

was improved due to medication, but the plaintiff stated that she had interest in seeing a counselor. (*Id.*).

On February 20, 2013, the plaintiff presented with anxiety, which she stated began worsening when she lost her job in May 2012. (Tr. 648). The plaintiff stated that she was having panic attacks two to three times per month and, as her financial situation continued to deteriorate, she was "not able to sleep for a week." (*Id.*). Dr. Patti noted that the plaintiff's depression was worsening, and that the medication was not helping as it had in the past. (*Id.*). The plaintiff also stated that she would need to return home to Connecticut in the next two to three months to be with her father. (*Id.*). The plaintiff returned to Summit Physician Services on March 5, 2013, where she presented with worsening back pain due to her increased activity in anticipation of her move to Connecticut. (Tr. 647). Dr. Patti noted that pain management was difficult for the plaintiff because she had run out of medication and did not have insurance to cover it. (*Id.*). Dr. Patti noted further that the plaintiff showed distress with movement. (*Id.*).

On October 17, 2013, the plaintiff underwent a psychosocial assessment at Family Service of Greater Waterbury. (Tr. 689). The plaintiff presented with depression and anxiety, and she expressed that it was difficult being in the service industry and dealing with customers while struggling with chronic back pain and anxiety. (*Id.*). The plaintiff's therapist, John Gibson, recorded that the plaintiff's anxiety presented two to three times per month, with the initial experience occurring in 2000. Gibson recorded further that the plaintiff was first diagnosed as clinically depressed in her early twenties, which the plaintiff attributed to her second marriage. (*Id.*). Gibson's initial assessment was that the plaintiff appeared "severely depressed" and was "guarded" but also "motivated to work on her problems and feel better." (Tr. 695).

6

On October 21, 2013, the plaintiff visited Diagnostic Radiology Associates where she had magnetic resonance imaging scans taken of her lumbar back. Dr. Sunil D'Cunha noted that the plaintiff's "vertebral body heights" were "well maintained," and that the plaintiff had "normal alignment." (Tr. 666). Dr. D'Cunha noted further that there was "degenerative loss of disc height at the L3-L4 level, with a broad disc bulge. . . . Enhancing scar tissue surrounds the left L5 nerve root. . . . Degenerative changes involve the L4-5 facet joints bilaterally." (*Id.*). As to L5-S1, Dr. D'Cunha noted that there was "degenerative loss of disc height, with a disc bulge, marginal osteophyte formation and facet and ligamentous hypertrophy bilaterally." (*Id.*).

On October 31, 2013, the plaintiff again met with Gibson for mental health therapy, where she presented with depression that she attributed to an argument with her father. The plaintiff detailed her poor relationship with her father and stated that his disapproval of her was "a lifetime cause of her depression." (Tr. 708).  The plaintiff stated further that her abusive relationships with her two ex-husbands were also a source of her depression. (*Id.*). During therapy on November 21, 2013, the plaintiff identified three triggers to her anxiety: "pain, yelling, and her finances." (Tr. 706). Gibson recorded that the plaintiff was not engaged in exploring concepts related to her anxiety disorder and, instead, stated that Gibson had to tell her what was wrong with her. (*Id.*).

On December 16, 2013, the plaintiff visited the Neurosurgery and Comprehensive Spine Center at the University of Connecticut ("UConn") Health Center for her lumbar back pain. (Tr. 669). The plaintiff reported that the severity of her pain was a nine out of ten and "occurs persistently." When asked about the pain, the plaintiff described it as "an ache, burning numbness and stabbing" and that physical therapy "made it worse." (*Id.*). The plaintiff also stated that the pain radiated to her buttock area bilaterally and down her right leg posteriorly. (*Id.*). After

undergoing an MRI, Lara Labarbera, PA confirmed that the plaintiff's L4-5 and L5-S1 showed two-level degenerative disc disease with moderate stenosis at both levels. (Tr. 671).

On January 2, 2014, the plaintiff visited Staywell Health Care, where she presented with chronic lower back pain, anxiety, and osteoarthritis. (Tr. 712). Dr. D'Cunha recorded that the plaintiff's neck and lumbar pain persisted and had not controlled since her last visit. (*Id.*). The plaintiff stated that she still sometimes feels insomnia as well as ringing in her ear since 2011. (*Id.*). Dr. D'Cunha noted that the plaintiff "walks little" and that "walking or standing worsens [the] pain." (Tr. 713). Dr. D'Cunha noted further that the plaintiff was "able to get up on [the] exam table without a problem" and was "able to lie down" but, in so doing, felt pain in the L3-L4 area of her spine. (Tr. 714). Dr. D'Cunha and the plaintiff also discussed her nicotine dependency, and he provided her with tips on how to quit smoking cigarettes. (Tr. 715).

On February 4, 2014, the plaintiff returned to Staywell Health Care for her follow up appointment where she presented with depression, nausea, chronic lower back pain, tingling, and joint pain in her lower back and neck areas. (Tr. 717). Dr. D'Cunha again observed that the plaintiff's symptoms had not controlled since her last visit. (*Id.*). Dr. D'Cunha noted that the plaintiff needed to be nicotine free before he could schedule her for surgery. (*Id.*). The plaintiff continued to have pain in the L2-L4 area and Dr. D'Cunha observed that the plaintiff's deep tendon reflexes were abnormal. Additionally, the plaintiff continued to experience anxiety three times per month. (Tr. 718).

On August 22, 2014, the plaintiff returned to the UConn Health Center for her neck pain, which her treater, Dr. Joseph Walker III, noted was of 30 years duration. (Tr. 736). Dr. Walker observed that the "severity of the problem [was] moderate" but that the problem had gotten worse and the frequency of the pain was constant. Dr. Walker observed further that there was "radiation

of pain to the right upper arm, right elbow, right hand and right thumb. The patient describe[d] the pain as aching, burning and stabbing. The event(s) surrounding the occurrence of the symptom do not include injury. Trauma occurred due to no injury. Aggravating factors include exertion, flexion, hyperextension, and rotation. . . . The patient experience[d] no relief from ice, muscle relaxation techniques, narcotic analgesics and NSAIDs." (Tr. 736). Dr. Walker reasoned that the "etiology of pain [was] from cervical stenosis/cervical radiculopathy." (Tr. 739). In his treatment plan, Dr. Walker noted, "[g]iven the patient's lack of relief from medications and physical therapy, a trial of interlaminar cervical epidural steroid injections [would] be utilized at the left, mid line, [and] right C7, T1 level(s) to decrease the inflammatory component associated with the pain." (*Id.*). Dr. Walker encouraged the plaintiff to quit smoking and to follow up in four weeks after scheduling injections with Farmington Surgery Center. (Tr. 740).

On September 29, 2014, the plaintiff visited StayWell Health Center and presented with spasms in her neck and back that worsened after standing for prolonged times, which interfered with her work. (Tr. 816). Dr. D'Cunha noted that the plaintiff still had chronic lower back pain and tingling of the limbs. (*Id.*). Dr. D'Cunha noted further that the plaintiff had stopped smoking. (*Id.*). Dr. D'Cunha observed that the plaintiff was in "no acute distress" and she was able to kneel and view the data shown to her on the computer while sitting cross legged on the exam table. (Tr. 817). Dr. D'Cunha also observed that the plaintiff's cervical spine showed full range of motion except when turning to her right side on side-to-side movements. (*Id.*).

On October 29, 2014, the plaintiff, having received her epidural steroid injections on September 16 and September 30, returned to the UConn Health Center for a follow up on her cervical back pain. (Tr. 731). Dr. Walker noted that the plaintiff's pain relief from the injections lasted only four weeks. Dr. Walker noted further that the plaintiff's pain, which she rated as an

eight out of ten, was not in the same location as it was initially. (*Id.*). The plaintiff stated that she noticed benefits from bending, walking, sitting, standing, and engaging in daily activities. (*Id.*). The plaintiff also stated that she did not wish to have a repeat injection and that she was not interested in continued physical therapy. (Tr. 731, 733). Dr. Walker observed that the plaintiff's gait was non-antalgic and not broad-based, and the plaintiff was "able to heel and toe walk normally." (Tr. 733). Dr. Walker assessed that the plaintiff had cervical spinal stenosis and lumbar spinal stenosis without cramping pain in the legs. (Tr. 734).

On December 30, 2014, Dr. Hilary Onyiuke evaluated the plaintiff's candidacy for cervical spinal surgery. (Tr. 728). The plaintiff stated that she did not get any pain relief from the steroid injections. (*Id.*). After reviewing the plaintiff's MRI scan of her cervical spine, Dr. Onyiuke observed that the plaintiff showed "cervical spondylotic disease with a reversal of cervical spine lordosis" and an "early kyphotic deformity at C5 to C7 compatible with her clinical presentation of cervical radiculopathy syndrome." (Tr. 730). Dr. Onyiuke reasoned, however, that the plaintiff was not yet ready for surgery. (*Id.*). Specifically, Dr. Onyiuke noted that the plaintiff's clinical psychologist needed to address and clarify some "psychological overlays," and the plaintiff's pain physician needed to reduce her daily dosage of pain medication. (*Id.*). Dr. Onyiuke deferred surgery until those discrepancies were cleared. (*Id.*).

On March 13, 2015, the plaintiff revisited the UConn Health Center and presented with increased neck pain. (Tr. 725). Labarbera, noted that the plaintiff did not follow through with any of Dr. Onyiuke's December 30, 2014 recommendations. (*Id.*). Consequently, Labarbera informed the plaintiff that surgery was not a viable option until the plaintiff reduced her daily dosage of narcotic medication to 30mg, which would require an appointment with her pain management

physician. (Tr. 272). Labarbera explained further that the plaintiff could schedule a follow-up appointment once that had occurred. (*Id.*).

On November 11, 2015, the plaintiff met with Dr. D'Cunha where she presented with loose bowel movements due to her medication. (Tr. 774). Dr. D'Cunha noted that the plaintiff was "taking some old meds" and had been dismissed from pain management. (*Id.*). The plaintiff admitted to "cheating" because she was still smoking. (*Id.*).

On January 14, 2016, during a follow-up with Dr. D'Cunha, the plaintiff presented with persistent back pain and expressed having had problems with pain management. (Tr. 768). The plaintiff wanted to discuss seeing another surgeon. (*Id.*). Dr. D'Cunha noted that the patient was sitting on the exam table with legs "in a figure of four" and showed no signs of distress. (*Id.*). Dr. D'Cunha noted further that the plaintiff was able "to jump off the exam table to retrieve a form she needed me to look at." (*Id.*).

On March 3, 2016, Jeffrey Sullo, MA completed a mental impairment questionnaire concerning his treatment of the plaintiff.[3] (Tr. 918-924). Sullo began seeing the plaintiff on July 15, 2014 and saw the plaintiff weekly through the date of the mental impairment questionnaire. (Tr. 920). Sullo noted that he diagnosed the plaintiff with generalized anxiety disorder, which he observed began "about 34 years ago" with symptoms including sleep disturbances, bad appetite, and panic attacks. (*Id.*). Sullo also noted that the plaintiff had "slow progress in therapy." (*Id.*). Sullo described the plaintiff's general appearance as "appropriate" and described her cognitive status by noting that her "memory is often clouded, [she] will lose train of thought while speaking." (Tr. 921). Sullo noted that the plaintiff's characteristics of speech were "within normal limits" and that the plaintiff's thought content consisted of "anxious thoughts, but no hallucinations present."

---

[3] Dr. L. Sobel provided her co-signature to Sullo's report on March 3, 2016. (Tr. 924). The ALJ referred to these medical opinions as authored by Dr. Sobel. (Tr. 30-31).

(*Id.*). Sullo indicated that the plaintiff's main topics of complaint were "chronic pain in neck and back [and] poor sleep." (*Id.*). Sullo described the plaintiff's mood and affect as "anxious with some depressive symptoms" and described her judgment and insight as "normal." (*Id.*).

With respect to the plaintiff's activities of daily living ("ADL"), Sullo rated the plaintiff's ability to take care of her personal hygiene as a four out of seven or, "average," her ability to care for physical needs as a two out of seven or, "limited ability," her ability to use good judgment regarding safety and dangerous circumstances as a three out of seven or, "reduced ability," her ability to use appropriate coping skills as a one out of seven or, "no ability," and her ability to handle frustration appropriately as a three. (Tr. 922). In his explanation of the plaintiff's ADL issues, Sullo stated that the plaintiff had "[d]ifficulty employing or remembering coping skills when dealing [with] increased anxiety." (*Id.*).

Using the same scale as to the plaintiff's social interactions, Sullo rated the plaintiff's ability to interact appropriately with others as a three, her ability to ask questions or request assistance as a two, her ability to respect and respond appropriately to others in authority as a two, and her ability to get along with others without distracting them or exhibiting behavioral extremes as a three. (Tr. 923). With respect to the plaintiff's task performances, Sullo rated the plaintiff's ability to carry out single-step instructions as a four, her ability to carry out multi-step instructions as a one, her ability to focus long enough to finish simple activities or tasks as a two, her ability to change from one simple task to another as a two, her ability to perform basic activities at a reasonable pace as a two, and her ability to persist in simple activities without interruption from psychological symptoms as a two. (*Id.*). Sullo described the plaintiff's issues with task performance as, "[c]hronic pain with resulting anxiety/depression negatively affects [her] ability to complete tasks." (*Id.*).

On April 30, 2016, Dr. Cheryl Ellis completed a mental evaluation of the plaintiff. (Tr. 925). Dr. Ellis described the plaintiff's chief complaints as having "been in pain for the past ten years which has driven her to depression. [the plaintiff] reports that she naturally has anxiety and [has] always been a sensitive person." (*Id.*). Dr. Ellis noted that the plaintiff was diagnosed with depression in 2013 at Family Services of Greater Waterbury, and that the plaintiff was also being considered for PTSD due to her hypervigilance about "footsteps, voices, and door slamming." (*Id.*). The plaintiff reported that her anxiety had persisted her entire life and likely spawned from her parents drinking, fighting, constant criticism, and being bullied by her sister. (*Id.*). The plaintiff reported further that her medication and marijuana helped alleviate anxiety, and that her anxiety worsened when she thought about her problems, had to fill out forms or was subjected to raised voices. (Tr. 926).

With respect to her mental status, Dr. Ellis observed that the plaintiff's appearance was appropriate, that she was engaged and cooperative, and that she described her mood as depressed and despondent, which Dr. Ellis reasoned was "incongruent with a more jovial engaging affect." (Tr. 927). Dr. Ellis also observed that the plaintiff's "thought process was coherent, logical, and goal directed." Dr. Ellis observed further that the plaintiff's speech was clear, her memory was "intact," and her fund of knowledge and concentration appeared to be "good." (*Id.*).[4]

On July 23, 2016, the plaintiff underwent a disability evaluation with Dr. Herbert Reiher. (Tr. 929). Dr. Reiher observed that the plaintiff had "[n]ormal gait and grip strength" and could "walk on [her] heels and toes and squat." (Tr. 930). Dr. Reiher also observed that the plaintiff's upper and lower extremity range of motion was normal. (*Id.*). After completing a physical

---

[4] Dr. Ellis's report cuts off with a page of notes missing from the record. The Social Security Administration's Office of Appellate Operations noted this discrepancy, citing the incompleteness of the exhibit as the ground for remand of the ALJ's March 28, 2018 decision. (Tr. 263).

evaluation, Dr. Reiher reasoned that the plaintiff "could be expected to sit for 8 hours in an 8-hour workday. She could be expected to stand for 8 hours in an 8-hour workday. She could be expected to walk for 8 hours in an 8-hour workday. . . . She could be expected to lift 10 pounds occasionally for one-third of a workday. She has postural limitations of back pain with repetitive bending and crouching. She has manipulative limitations of neck pain with repetitive reaching. She has no workplace environmental limitations." (Tr. 931).

On August 18, 2017, the plaintiff presented to Adam Riso, PA with radiating neck pain and numbness and tingling in her right index finger. (Tr. 939). Riso noted that the plaintiff had been evaluated for surgery at UConn Health Center three years ago but, after the plaintiff "questioned the scope of the surgery," her physician "got mad at her and asked her to leave." (*Id.*). The plaintiff complained of "fine motor dysfunction and gait disturbance," and described the aggravating factors to her pain as bending, exercising, kneeling, standing, walking, and climbing stairs. (*Id.*). In her global health scale, the plaintiff stated that her quality of life was poor, her physical health was poor, her mental health was fair, and her ability to carry out her usual activities was poor. (*Id.*). The plaintiff also stated that she could "moderately" carry out her everyday physical activities. (*Id.*). After an examination, Riso observed that the plaintiff had "no restriction in cervical flexion, extension, rotation, or lateral bending," and maintained "full strength throughout [her] bilateral upper extremities. . . . Full painless range of motion of the bilateral shoulders." (Tr. 941). Riso noted that the plaintiff stated repeatedly that "she needs surgery," but he was unable to make that determination without reviewing her MRI images. (Tr. 942).

On August 28, 2017, the plaintiff followed up with Dr. Maxwell Scott, who would review her MRI images and provide further treatment recommendations. (*Id.*). Upon review, Dr. Scott noted that the plaintiff's cervical spine was "notable for multilevel foraminal stenosis and

degenerative disc changes." (Tr. 945). Dr. Scott did not recommend surgical intervention and, instead, referred the plaintiff to New Solutions for pain management. (*Id.*).

On September 5, 2017, the plaintiff underwent a behavioral health evaluation at Catholic Charities Archdiocese of Hartford. (Tr. 956). The plaintiff presented with moodiness, loss of appetite, insomnia, and PTSD, all of which she stated had a "severe" impact on her life. (*Id.*). Frederick Hyman, the plaintiff's clinician, diagnosed the plaintiff with depression and PTSD and set a goal to alleviate the plaintiff's depressive symptoms so that she could "return to [her] previous level of effective functioning." (Tr. 971).

On September 16, 2017, the plaintiff described feeling hopeless and down and having no energy to do things more than half the time. (Tr. 975). The plaintiff also reported that nearly every day she felt like a failure, had trouble sleeping, and had little pleasure in doing things. (*Id.*). Hyman assigned the plaintiff a PHQ assessment score of 22, which indicated "major depression" requiring severe antidepressant and psychotherapy. (Tr. 976-77). Hyman also assigned the plaintiff a disability score of 52 out of 100. (Tr. 978).

On October 16, 2017, the plaintiff reported feeling "very anxious" and was "not aware of why." (Tr. 1000). The plaintiff stated that she was being vigilant about her aunt's health in light of her aunt's congestive heart failure but was also feeling anxious at her inability to identify her feelings. (*Id.*). On October 23, 2017, Hyman observed that the plaintiff "felt depressed" and was in "a lot of pain from her neck problem" to that point that it was "debilitating." Hyman observed further that the plaintiff was "unable to accept her pain because it [was] so great" and that she managed it "sometimes with THC." (Tr. 1005). The plaintiff's diagnosis and disability score of 52 remained unchanged. (Tr. 998).

On November 21, 2017, Hyman observed that the plaintiff was still struggling with her pain, noting that the plaintiff "cannot sleep when [the] pain spikes to 10." (Tr. 1241). Hyman noted that the plaintiff "was not open to any [of his] suggestions[s]," which included baths, progressive relaxation, and art therapy. (*Id.*). Hyman stated that it was "unclear what to do next for her" but he planned to discuss with the plaintiff "her feelings and reactions to the pain which may be [the] cause of [her] depression." (*Id.*).

On December 5, 2017, the plaintiff presented "in an irritable mood" due to her chronic back and neck pain, which she remained unable to alleviate. (Tr. 1246). Hyman noted that the plaintiff was "not open to intervention as evidenced by her negative reactions to many responses by counselor." (*Id.*). Hyman noted further that the plaintiff "impulsively got up before end of session and left, annoyed, and stated she would probably not be back." (*Id.*).

On December 6, 2017, the plaintiff visited Alliance Medical Group for onychomycosis and follow up regarding her chronic neck and back pain. (Tr. 1619). Dr. Nora Chokr noted that, based on her previous evaluation at Yale, the plaintiff was not a candidate for surgery because "it will not help with her symptoms and may in fact worsen the pain." (*Id.*). Dr. Chokr noted further that the plaintiff was referred to Yale pain management where she was recommended NSAIDs and steroid injections, both of which she rejected because they did not help her. (*Id.*). Upon physical evaluation, Dr. Chokr referred the plaintiff to physical therapy and prescribed medication and a portable muscle stimulation unit, or TENS unit, to address her persistent neck and back pain. (Tr. 1621-22).

On September 18, 2018, the plaintiff, by way of referral from the Social Security Office Bureau of Disability, underwent a psychiatric evaluation with Dr. Rahim Shamsi. (Tr. 1159). Upon examination, Dr. Shamsi observed that the plaintiff's affect was mild anxiety, that she seemed

oriented as to the date, that her past memory as to the events in her life was not impaired, and that she did not have a thought disorder. (Tr. 1160). Dr. Shamsi also observed that the plaintiff's "intelligence could be considered possibly at the lowest level of average or at the lower level of average. Her judgment was somewhat fair and she had some insight into her problems." (*Id.*). Dr. Shamsi noted further, "[b]ased on this interview, the diagnosis of major affective disorder, depressed, severe should be considered." (Tr. 1161). Dr. Shamsi concluded that the plaintiff "is in need of appropriate psychiatric treatment at this time. . . . In my opinion, this patient is able to understand instructions and get along with her supervisors, however, due to [the] severity of her physical and psychological difficulties it is obvious that at this time she is not able to engage in any gainful employment." (*Id.*).

On December 11, 2018, Amanda Tangney, LPC, a counselor at Tides of Mind Counseling, completed a mental impairment questionnaire regarding her assessment of the plaintiff from her sessions dating from June 27, 2018 to December 7, 2018.[5] (Tr. 1583). Tangney noted that the plaintiff had normal speech, a goal-oriented thought process, was consistently oriented to time and place, possessed good insight, and was capable of keeping herself well-groomed. (Tr. 1584). Tangney also noted that the plaintiff could slowly complete tasks because of her physical impairments. (*Id.*). Tangney observed that the plaintiff showed signs of "fatigue, mood impairment, impaired concentration, insomnia, anxiety, panic attacks, and trauma." (Tr. 1584). Tangney indicated that the plaintiff's decline in memory, concentration, and/or cognition was

---

[5] On May 17, 2019, Tangney drafted a letter summarizing the content of the plaintiff's sessions dating back to her initial intake on June 27, 2018. (Tr. 16). In her memorandum before this Court, the plaintiff indicated that Tangney's May 17, 2019 letter "was submitted in lieu of records by the provider to supplement her earlier opinion." (Pl.'s Mem. at 4). On or about March 16, 2020, the Appeals Council received Tangney's letter, as well as x-rays taken of the plaintiff's lumbar spine at Waterbury Hospital on May 23, 2019, (Tr. 13-14), and added them as evidence for its consideration in plaintiff's request to review. (Tr. 5). In its March 16, 2020 letter denying the plaintiff's request for review of the Administrative Law Judge's April 3, 2019 decision, the Appeals Council stated that the additional evidence "does not show a reasonable probability that it would change the outcome of the decision." (Tr. 2).

related to severe depression or anxiety. (Tr. 1584). With respect to the plaintiff's task performance abilities, Tangney indicated that the plaintiff has difficulties performing basic work activities at a reasonable pace and performing work activity on a sustained basis. (Tr. 1587). Conversely, Tangney noted that the plaintiff does not have difficulty carrying out single-step or multi-step instructions. (*Id.*). Tangney also noted that the plaintiff's panic attacks lasted 30 minutes and took two or more hours to recover from, occurred at least twice a week and without warning, and were often triggered by loud noise, appointments, social events, presence of other people, time deadlines or pressure, and the need to make decisions." (Tr. 1588-90).

With respect to the plaintiff's mental abilities and aptitudes needed to sustain unskilled work, Tangney noted that the plaintiff was "very good" at understanding and remembering very short and simple instructions, sustaining an ordinary routine without special supervision, making simple work-related decisions, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers, and responding appropriately to changes in a routine work setting. (Tr. 1593). Conversely, Tangney stated that the plaintiff was "seriously limited" in her abilities to "complete a normal workday and workweek without interruptions from psychologically based symptoms" and had "no useful ability" to "perform at a consistent pace without an unreasonable number and length of rest periods." (*Id.*).

Lori Pelosi, LPC completed a similar mental impairment questionnaire regarding her assessment of the plaintiff from her monthly sessions dating from October 3, 2018 to December 18, 2018.[6] (Tr. 1667-1683). Pelosi first identified the plaintiff's symptoms as sadness, low energy, crying, and lack of motivation. (Tr. 1668). Pelosi also noted that the plaintiff was well-groomed. (Tr. 1668). Using an identical rating scale to the one used in Tangney's report, Pelosi evaluated

---

[6] Pelosi's questionnaire is not dated, and there is no indication as to the date when she completed the questionnaire in the supporting documents. (*See* Tr. 1683).

the extent to which the plaintiff's mental impairments limited her activities of daily living. (Tr. 1670). First, with respect to the plaintiff's social interaction, Pelosi found that the plaintiff had a "very serious problem" with caring for her physical needs without assistance, but that she only had a "slight problem" taking care of person hygiene, using good judgment, using appropriate coping skills to meet work demands, and handling frustration appropriately without assistance. (*Id.*).

With respect to the plaintiff's task interaction, Pelosi found that the plaintiff had a "serious problem" interacting appropriately with others in a work environment and getting along with others without distracting them or exhibiting behavioral extremes. (*Id.*). Pelosi also found that the plaintiff had only a "slight problem" with asking questions and responding appropriately to authority. (*Id.*). Finally, with respect to task performance, Pelosi found that the plaintiff had only a "slight problem" with carrying out single and multi-step instructions, focusing long enough to finish simple tasks, performing basic work activities at a reasonable pace and finishing on time, and performing work activity on a sustained basis. (Tr. 1671). Pelosi noted further that the plaintiff had panic attacks, without warning, that occurred at least twice weekly and that would be triggered "situationally," such as from leaving the home, driving, needing to make decisions, being around other people, and dealing with time deadlines. (Tr. 1672-73).

Pelosi also completed additional surveys on varying grade scales regarding the plaintiff's mental abilities to sustain unskilled work, semi-skilled and skilled work, and other activities. (Tr. 1677-78). Pelosi recorded that the plaintiff is "seriously limited" in areas such as making work related decisions, maintaining regular attendance, requesting assistance, accepting instructions and responding appropriately to supervisors, getting along with co-workers, responding appropriately to changes in a routine work setting, and dealing with work stress. (*Id.*). Additionally, Pelosi noted that the plaintiff was "unable to meet competitive standards" with interacting with the general

public and maintaining socially appropriate behavior and "very good" with adhering to basic standards of cleanliness and traveling in an unfamiliar place. (Tr. 1678). Pelosi also noted that the plaintiff's intellectual functioning was not limited and did not decline significantly during periods of severe depression. (Tr. 1679).

Pelosi completed a final survey where she rated the plaintiff's degree of limitation across a variety of areas on a scale from "none or mild" limitation to "no useful function." (Tr. 1680). Pelosi recorded that the plaintiff had no limitations with understanding and applying information and a "moderate" limitation with remembering information and interacting with others. (Tr. 1680). Pelosi recorded further that the plaintiff had a "marked" limitation with concentrating, persisting, maintaining pace, adapting in the workplace, and managing herself in the workplace. (Tr. 1680).

III.    THE ALJ'S DECISION

At the outset of his decision, the ALJ acknowledged that the Appeals Council had remanded his initial decision "to obtain addition[al] evidence concerning the claimant's mental impairments and further evaluate these impairments, give further consideration to the residual functional capacity during the entire period at issue[] and obtain supplemental evidence from a vocational expert if warranted." (Tr. 22). The ALJ went on to state that the "primary reason listed for remanding this case was a missing page from the consultative examination report contained in Exhibit B12F. In the remand order, the appeals Council directed the undersigned to make efforts to obtain the missing information. The undersigned has made efforts to obtain the missing page from the consultative examination report, however, due to the age of the report, this was not possible. As an alternative remedy, the undersigned has obtained an additional consultative examination." (*Id.*).

20

Following the five-step evaluation process,[7] the ALJ first found that the plaintiff met the insured status requirements of the Social Security Act through December 31, 2017, and that the plaintiff had not engaged in substantial gainful activity since March 23, 2012, the alleged onset date. (Tr. 25, citing 20 C.F.R. §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

At step two, the ALJ concluded that the plaintiff had the severe impairments of degenerative disc disease of the cervical and lumbar spine and that the plaintiff's impairments significantly limited her ability to perform basic work activities as required by SSR 85-28. (Tr. 25, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). The ALJ concluded further, however, that the plaintiff's impairment of depression was non-severe. (*Id.*). In support of his conclusion, the ALJ relied on the plaintiff's treatment records, which he reasoned were illustrative of the plaintiff's inability to manage "situational stressors," such as "family strife" and financial insecurity. (*Id.*). The ALJ noted that, although the plaintiff presented as depressed and anxious over the course of the relevant period, she also "consistently demonstrate[d] an intact memory, normal speech, intact judgment and insight and good impulse control. Additionally, the claimant regularly denied suicidal ideation during the relevant period." (*Id.*).

---

[7] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, the claimant will have to show that she cannot perform her former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

In reaching the conclusion that the plaintiff's mental impairment was non-severe, the ALJ considered the four broad functional areas set out in the disability regulations for the evaluation of mental disorders in section 12.00C of the Listing of Impairments. (Tr. 25, citing 20 C.F.R., Part 404, Subpart P, Appendix 1). Using the four broad functional areas of "understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing themselves," the ALJ found that the plaintiff had only "mild limitation of understanding, remembering and applying information, mild limitation in interacting with others, mild limitation of concentrating, persisting or maintaining pace and mild limitation of adapting and managing." (Tr. 25-26).

At step three, the ALJ found that the plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 26-27, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). The ALJ stated that the "medical evidence of record does not document listing level severity of the claimant's impairments, either individually or in combination and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (Tr. 27).

At step four, the ALJ determined that the plaintiff had the residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. §§ 404.1567 (b) and 416.967 (b), except that she would be limited to frequently climbing ramps and stairs and occasionally climbing ladders, ropes, or scaffolds, as well as frequently balance, stoop, kneel, crouch, and crawl. (Tr. 27). In reaching this conclusion, the ALJ gave "partial weight" to the opinion of consultative examiner, Dr. Herbert Reiher, "little weight" to the opinion of Dr. L. Sobel, who opined on the plaintiff's mental health impairments, "little weight" to the opinion of Dr. Cheryl Ellis, who opined on the

plaintiff's mental capacity, "little weight" to the opinion of Dr. Rahim Shamsi, "little weight" to the opinions of Amanda Tangney, LPC and Lori Pelosi, and "great weight" to the initial assessment provided by the State Agency consultants but "little weight" to the assessment provided at the reconsideration level. (Tr. 30-32).

At step five, the ALJ concluded that the plaintiff was capable of performing past relevant work as a data examination clerk, which does not require the performance of work-related activities precluded by the plaintiff's RFC. (Tr. 33 citing 20 C.F.R. §§ 404.1565 and 416.965). Accordingly, the ALJ found that the plaintiff was not under a disability from March 23, 2012 through April 3, 2019, the date which he rendered his decision. (Tr. 33).

IV.   STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 11 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)

(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's findings. *See id*. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff contends that the ALJ ignored the Appeals Council's order in its July 25, 2018 Notice of Remand to "[f]urther evaluate the claimant's mental impairments in accordance with the special technique described in 20 C.F.R. §§ 404.1520a and 416.920a. . . ." (Tr. 272). The plaintiff asserts that the ALJ departed from the Appeals Council's directive by failing to document the application of the technique using the standard form articulated in 20 C.F.R. § 404.1520a(e). (Pl.'s Mem. at 2-3). Additionally, the plaintiff maintains that the ALJ erred by (1) failing to explain the basis for his inconsistent assignment of weight to the opinions of the plaintiff's treating physicians (Pl.'s Mem. at 4-5); (2) not considering and weighing appropriately all the relevant evidence, including the new evidence (Pl.'s Mem. at 6-8, 12-19); and (3) not clarifying and developing certain medical evidence and, instead, applying his own interpretation of the medical data. (Pl.'s Mem. at 9-11).

In response, the defendant argues that the ALJ did, in fact, comply with the Appeals Council's directive by evaluating the plaintiff's mental impairments in accordance with 20 C.F.R. §§ 404.1520a(c) and 416.920a(c), and incorporated appropriately the pertinent findings from

plaintiff's medical records. (Def.'s Mem. at 6). Specifically, the defendant maintains that the ALJ afforded the proper weight to the opinions of Dr. Shamsi, Lori Pelosi, and Amanda Tangney. (Def.'s Mem. at 8-13). The defendant asserts further that substantial evidence supports the ALJ's decision, contrary to the plaintiff's contention that the ALJ misapprehended the record. (Def.'s Mem. at 15-16).

A.   THE ALJ'S COMPLIANCE WITH THE APPEALS COUNCIL'S ORDER

The basis for the Appeals Council's July 25, 2018 remand was to resolve a gap in the record created by Dr. Cheryl Ellis's incomplete report. (Tr. 263). Accordingly, the Appeals Council ordered the ALJ to (1) "[o]btain additional evidence concerning the claimant's alleged depression and anxiety"; (2) "[f]urther evaluate the claimant's mental impairments in accordance with the special technique described in 20 C.F.R. §§ 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c)"; (3) "[g]ive further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations . . . evaluate the treating and nontreating source opinions pursuant to the provisions of 20 C.F.R. §§ 404.1527 and 416.927 and nonexamining source opinions . . . and explain the weight given to such opinion evidence"; and (4) "[i]f warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." (Tr. 271-72).

Addressing first the requirements under 20 C.F.R. § 404.1520a(e), the defendant is correct that the ALJ complied with the Appeals Council's directive insofar as he "document[ed] application of the technique in the decision." 20 C.F.R. § 404.1520a(e). Contrary to the plaintiff's

contention, the ALJ was not obligated to complete the standard document to record how he applied the technique. *See id.* In his written decision, the ALJ was required to "incorporate the pertinent findings and conclusions based on the technique," to "show the significant history . . . considered in reaching a conclusion about the severity of the mental impairment(s)," and to "include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section." 20 C.F.R. § 404.1520a(e)(5). The ALJ did just that when he explicitly considered the four broad functional areas for the evaluation of mental disorders. (Tr. 25, citing 20 C.F.R., Part 404, Subpart P, Appendix 1). In accordance with the Appeals Council's order, the ALJ explained the relevant evidence he considered in making specific findings as to the degree of the plaintiff's limitations in each functional area and ultimately determined that the plaintiff had only "mild limitation of understanding, remembering and applying information, mild limitation in interacting with others, mild limitation of concentrating, persisting or maintaining pace and mild limitation of adapting and managing." (Tr. 25-26).

Moreover, the ALJ acknowledged that the missing page from Dr. Ellis's report could not be obtained and, in an effort to resolve the gap in the record created by the missing information, the ALJ obtained Dr. Shamsi's report for an additional consultative examination. (Tr. 29). The undersigned agrees with the defendant that this demonstrated compliance with the Appeals Council's order and, likewise, disagrees with the plaintiff's contention that the ALJ's rejection of Dr. Shamsi's report left unresolved the gap in the record.

B.    THE ALJ'S ANALYSIS OF THE PLAINTIFF'S MENTAL HEALTH RECORDS

The plaintiff also challenges the ALJ's assignment of weight to her treating physicians' reports and maintains that the ALJ did not consider the evidence that favored granting benefits to her. (Pl.'s Mem. at 4). Specifically, the plaintiff points to the opinions of Tangney and Pelosi,

asserting, "[t]he ALJ overlooked the bulk of Ms. Tangney's opinion" and "the opinions were remarkably consistent and similar not only with each other but with [the] new consultative examiner report." (Pl.'s Mem. at 6, 7). In response, the defendant maintains that the ALJ correctly assigned little weight to the opinions of Dr. Shamsi, Tangney, and Pelosi. (Def.'s Mem. 10-15).

In reaching his conclusion that the plaintiff's mental impairment was "non-severe," the ALJ considered the four broad functional areas for measuring degree of functional capacity and reasoned that the plaintiff's condition caused "no more than 'mild' limitation in any of the functional areas." *See* 20 C.F.R. § 404.1520a(c)(3). (Tr. 25). First, the ALJ stated that the plaintiff "demonstrated intact remote, recent and immediate memory," citing to the fact that the plaintiff could "perform activities of daily living" and showed "the ability to participate and engage in her own medical care without assistance." (Tr. 26). Second, the ALJ relied on records of the plaintiff being described as "cooperative and polite" to conclude that she only had a "mild limitation" in interacting with others. (*Id.*). Third, the ALJ noted that the plaintiff's limitations as to concentrating, persisting, or maintaining pace were due "primarily to her physical condition as opposed to her mental health symptoms." (*Id.*). In light of the fact that the plaintiff was able to "perform a three-step command and . . . assist elderly relatives with the performance of activities of daily living[,]" the ALJ reasoned that the plaintiff only had a mild limitation. (*Id.*). Finally, the ALJ reasoned that the plaintiff had only a "mild limitation" in adapting and managing herself because her treatment records were focused primarily on "increasing the [plaintiff's] coping skills to help her better manage situational stressors." (*Id.*). Accordingly, the ALJ concluded that the plaintiff's mental impairment was non-severe. (*Id.*).

At step four of his analysis, the ALJ further considered the plaintiff's mental health records, relying on some findings as evidence of the plaintiff's functional capacity to perform light work,

while discrediting others. (Tr. 30-32). Specifically, the ALJ found consultative examiner, Dr. Shamsi's, conclusion that the plaintiff was "not able to engage in any gainful employment" inapposite with Dr. Shamsi's findings that the plaintiff was polite, cooperative, responsive, and mentally intact. (Tr. 31). Although the ALJ reasoned that Dr. Shamsi's findings were consistent generally with the plaintiff's other treatment records, the ALJ found that Dr. Shamsi's "ultimate conclusion" was inconsistent with "his own findings [and] the findings within the substantial evidence." (*Id.*). Accordingly, the ALJ assigned little weight to Dr. Shamsi's opinion. (*Id.*).

Similarly, the ALJ considered the clinical findings of Dr. Sobel and reasoned that "the [plaintiff's] treatment records are indicative of a greater level of functioning. For example, the [plaintiff] has reported the ability to cook, clean and drive. Additionally, she has reported caring for elderly relatives, shopping and managing her own finances." (Tr. 30). The ALJ, therefore, assigned little weight to the opinion of Dr. Sobel. (Tr. 31).

The ALJ also considered the reports of Tangney and Pelosi, noting the inconsistencies in their findings despite their assessment forms posing similar or the same questions. (Tr. 31). Specifically, the ALJ stated, "[d]ue to the convoluted nature of the form[s] provided, these opinions are full of contradictory assessments, making it impossible to determine the actual opinions of Ms. Tangney and Ms. Pelosi." (*Id.*). Notably, the ALJ referenced the varied scales used by Tangney as a source of confusion, stating "[i]n considering just the area of concentration as it relates to the [plaintiff's] ability to complete tasks, Ms. Tangney's opinion suggests that the [plaintiff] has no difficulty completing detailed tasks, that she is unable to maintain pace, that she has no difficulty concentrating, as well as difficulty concentrating and that the claimant is not distractible, but cannot maintain attention and concentration for two hours." (Tr. 32). In addition to inconsistencies in the assessments, the ALJ also cited to the fact that neither Tangney nor Pelosi

had regular interactions with the plaintiff as a basis for assigning little weight to their opinions. (*Id.*).

In disability claims, like this one, filed prior to March 27, 2017, the ALJ must evaluate medical opinions in accordance with the factors set forth at 20 C.F.R. §§ 404.1527 and 416.927 in deciding how much weight, if any, to afford to each medical opinion.[8] 20 C.F.R. § 404.1527(c). To that end, the "treating physician rule" requires the ALJ to give special deference to the medical opinions of a physician who is engaged in the primary treatment of the claimant. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). As the Second Circuit has explained:

> First, the ALJ must decide whether the opinion is entitled to controlling weight. [T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record. . . .Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, it must explicitly consider the following, nonexclusive *Burgess* factors: (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist. . . . At both steps, the ALJ must give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion.

*Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (citations and internal quotation marks omitted). It is well established that failure to "explicitly consider" the foregoing factors constitutes procedural error warranting remand, unless a "searching review of the record shows that the ALJ provided 'good reasons' for its weight assessment." *Guerra v. Saul*, 778 F. App'x. 75, 77 (2d Cir. 2019) (summary order). Nevertheless, the regulations do not require the ALJ to give an exhaustive explanation as to his assignment of weight to every piece of evidence available. *See Milner v. Berryhill*, No. 3:18-cv-01276 (SRU), 2019 WL 4875025, at *9 (D. Conn. Oct. 3, 2019) ("The

---

[8] On March 27, 2017, the Social Security Administration revised the medical opinion criteria for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 15132 (Mar. 27, 2017).

Second Circuit has stated that when the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion [regarding] disability." (citation and internal quotation marks omitted)).

As a threshold matter, none of the medical opinions regarding the plaintiff's mental health impairments came from a treating source. First, Dr. Shamsi's medical opinion was limited only to a single consultative examination on September 13, 2018 and, consequently, is not entitled to controlling weight. *See Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) ("[The Second Circuit] has previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination."). Second, Tangney and Pelosi are both therapists, which are considered "other medical sources" under the regulations and, similarly, not entitled to controlling weight. *See Young v. Berryhill*, No. 3:17-cv-00970 (SALM), 2018 WL 2947860, at *6 (D. Conn. June 12, 2018) ("Acceptable medical sources include, *inter alia*, licensed physicians. . . . APRNs, social workers, and physician assistants, amongst others, are not 'acceptable medical sources,' but rather are considered 'other sources.'" (citations omitted)). Third, Dr. Sobel's report, although entitled to more weight than an "other source" opinion, cannot be afforded controlling weight because her co-signature alone does not establish the extent to which she examined the plaintiff. *See*, *e.g. Godin v. Astrue*, No. 3:11-cv-881 (SRU), 2013 WL 1246791, at *2 (D. Conn. Mar. 27, 2013) (reasoning that ALJ should have considered whether medical questionnaire co-signed by treating physician qualified as an "acceptable medical source").

Regardless of its source, however, the ALJ must evaluate every medical opinion and assign to it some level of weight based on the factors identified in *Estrella*. 20 C.F.R. § 404.1527(c).

Notwithstanding some consistencies in their medical opinions, substantial evidence supports the ALJ's decision to assign little weight to the reports of Dr. Shamsi, Dr. Sobel, Tangney, and Pelosi. With respect to Dr. Shamsi, the ALJ noted that many of his findings were "consistent with the [plaintiff's] other treatment records," namely, her attentiveness, alertness, intact memory, and politeness. (Tr. 31). Nevertheless, Dr. Shamsi's diagnostic impression was that the plaintiff had major affective disorder and severe depression, the basis of which led him to determine that the plaintiff's mental impairment, coupled with her physical limitations, precluded her from engaging in gainful employment. (Tr. 1161). In light of the inconsistency of Dr. Shamsi's conclusion with his other findings and the findings of other treaters, the ALJ appropriately assigned little weight to his medical opinion. Moreover, to the extent that Dr. Shamsi's ultimate conclusion made a determination reserved for the Commissioner, the ALJ did not err in assigning little weight to his opinion. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Moreover, some kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are reserved to the Commissioner." (citation and internal quotation marks omitted)).

Unlike Dr. Shamsi's report, Dr. Sobel's report covered a longer length of treatment, summarizing the findings from the plaintiff's weekly therapy sessions from July 15, 2014 to March 1, 2016.[9] (Tr. 920). Despite the seemingly extensive treatment relationship, however, the ALJ correctly noted that "it is unclear what interactions Dr. Sobel has had with the [plaintiff] as this name does not appear within the [plaintiff's] treatment records." (Tr. 30-31). Indeed, the treatment records suggest that it was Jeffrey Sullo, MA and not Dr. Sobel who had established a treatment relationship with the plaintiff. (*See* Tr. 924). As to the substance of the medical opinions, Dr. Sobel

---

[9] As stated previously in this ruling, Dr. Sobel co-signed the subject report on March 3, 2016, which Jeffrey Sullo, MA authored on March 1, 2016. (Tr. 924). To that end, the Court agrees with the ALJ that the nature and extent of Dr. Sobel's treatment relationship with the plaintiff is uncertain and, therefore, should be afforded little weight. (*See* Tr. 30-31).

rated the plaintiff as having a "limited ability" in focusing long enough to finish simple tasks, changing from one task to another, performing basic tasks at a reasonable pace, and persisting in simple tasks without interruption from psychological symptoms. (Tr. 923). The ALJ, however, found those findings to be inconsistent with the plaintiff's "greater level of functioning." (Tr. 30). Specifically, the ALJ noted that the plaintiff reported the ability to cook, clean, drive, care for her elderly relatives, grocery shop, and manage her own finances. (Tr. 30). Although Dr. Sobel's report could be considered an "acceptable medical source;" *see Godin*, 2013 WL 1246791, at *2-3; the ALJ, having explicitly considered the inconsistent findings and uncertain treatment relationship, did not err in assigning it little weight.

Like Dr. Sobel, Tangney and Pelosi rendered their findings through a questionnaire using a check box format assessment. Their assessments were also consistent with Dr. Shamsi's conclusion that the plaintiff's mental impairments precluded her from maintaining gainful employment. Specifically, Tangney found that the plaintiff's mental impairments caused a "severe interference" with both her ability to perform basic work activities at a reasonable pace and her ability to perform work activity on a sustained basis. (Tr. 1587). Pelosi did not observe the same functional issues with the plaintiff's task performance in that rating scale, but she did note that the plaintiff was "seriously limited" in her ability to maintain regular attendance, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 1671, 1677).

Although there is some overlap between the reports, the ALJ cites to the lack of continuity in the scoring metrics and the inconsistency in the findings as the main reasons for his assignment of little weight to these assessments. (Tr. 31-32). "Due to the convoluted nature of the form

provided, these opinions are full of contradictory assessments, making it impossible to determine the actual opinions of Ms. Tangney and Ms. Pelosi. . . . Reconciliation of the varied assessments, on different scales, with contradictory assessments is not possible, which renders this opinion unpersuasive." (*Id.*). In addition to the inconsistencies in the reports, the ALJ also points out that Tangney and Pelosi, like Dr. Shamsi, did not have regular interactions with the plaintiff. The Court agrees that Tangney's and Pelosi's opinions are entitled to little weight, particularly in light of the fact that questionnaires generally are not as useful when evaluating impairment. *See George v. Saul*, No. 3:19-cv-01456 (JAM), 2020 WL 6054654, at *3 (D. Conn. Oct. 14, 2020) ("The Second Circuit has previously held that medical opinions given in a standardized multiple-choice form are only 'marginally useful.'" (*citing Klodzinski v. Astrue*, 274 [F.] App'x. 72, 73 (2d Cir. 2008)).

In light of the evidence of record and the ALJ's good reasons as to his assessment of the relevant medical opinions, the Court rejects the plaintiff's contention that he failed to comply with the Appeals Council's order.

C.   THE COMMISSIONER'S REJECTION OF NEW EVIDENCE

In addition to challenging the ALJ's analysis of the mental health evidence on record, the plaintiff also challenges the Commissioner's failure to consider new evidence that she submitted to the Appeals Council with her April 6, 2019 request for review. (Pl.'s Mem. at 4). On March 16, 2020, the Appeals Council determined that Tangney's May 17, 2019 letter summarizing her findings during her course of treatment with the plaintiff would not change the outcome of the decision. (Tr. 2). The plaintiff maintains that "[r]emand is required because the Appeals Council ignored the new and material evidence that the Plaintiff presented that supported her claim. New evidence should have impacted the weight given to Ms. Tangney['s] earlier 12/11/18 opinion, which the ALJ had discounted." (Pl.'s Mem. at 4-5). Conversely, the defendant argues that the

Appeals Council properly rejected the new evidence because it was not "new, inconsistent, and material to the decision." (Def.'s Mem. at 13). Because the plaintiff's new evidence was cumulative in nature, the Commissioner did not err by concluding that it would not change the outcome of the decision. (*Id.*)

When submitted for its review, the Appeals Council must consider new and material evidence when it relates to the period on or before the ALJ's decision. *McIntire v. Astrue*, 809 F. Supp. 2d 13, 21 (D. Conn. 2010). "Evidence that is cumulative to that already contained in the record prior to the ALJ decision is, by definition, not 'new' and need not be considered. . . . Evidence is material if it is (i) relevant . . . and (ii) probative . . . ." *Id.* (citations omitted).

The plaintiff submitted Tangney's May 17, 2019 letter "in lieu of records by the provider to supplement her earlier opinion." (Pl.'s Mem. at 4). In her letter, Tangney noted that, dating back to the plaintiff's initial intake on June 27, 2018, their "sessions have routinely included discussions about how [the plaintiff's] chronic pain (mainly neck and back) has limited [the plaintiffs] ability to work." (Tr. 16). Tangney goes on to describe the plaintiff's treatment history, depressive symptoms, and affect throughout their work together. (*See* Tr. 16). As the defendant correctly points out, however, the Tangney letter is simply a summary and restatement of her findings that the ALJ previously had considered. (*See* Tr. 16) (Def.'s Mem. at 13). Because the May 17, 2019 letter was neither new nor probative, the Appeals Council did not err in rejecting it.

D.   THE ALJ'S ANALYSIS OF THE PLAINTIFF'S PHYSICAL IMPAIRMENT RECORDS

The plaintiff also argues that the ALJ failed to develop the record insofar as he did not seek clarification from the plaintiff's treating physicians on certain findings regarding the plaintiff's physical limitations and, instead, "provided his own interpretation of the raw medical data." (Pl.'s Mem. at 9). Furthermore, the plaintiff challenges the Commissioner's overall understanding of the

record to the extent that the ALJ made several conclusions regarding the plaintiff's physical limitations, including her ability to perform past work, that are not supported by the record. (Pl.'s Mem. at 11-15).

In reaching the determination that the plaintiff had the residual functional capacity to perform light work, the ALJ reasoned that the "documentary evidence does not support the level of limitation alleged by the [plaintiff]." (Tr. 28). The ALJ first noted that, based on her records from the UConn Health Center, the plaintiff's "lumbar spine condition is generally unchanged as compared to prior imaging." (Tr. 29). In addition, the ALJ determined that substantial evidence indicated that the plaintiff's course of treatment "was effective at controlling [her] pain." (*Id.*). Finally, the ALJ relied on the findings from physical examinations that observed that the plaintiff demonstrated a "normal gait" and a "limited range of motion of the lumbar spine" to conclude that the plaintiff's "lower back and neck pain are inconsistent with a finding of limitations greater than found in this decision." (*Id.*). In reaching these conclusions, however, the ALJ adopted his own interpretation of the objective medical evidence.

As early as October 2013, the plaintiff's treating physician, Dr. D'Cunha, observed a "degenerative loss of disc height, with a disc bulge, marginal osteophyte formation and facet and ligamentous hypertrophy bilaterally." (Tr. 666). In January 2014, Dr. D'Cunha noted that the plaintiff was suffering from insomnia as well as ringing in her ear since 2011. (Tr. 712). Dr. D'Cunha noted further that the plaintiff "walks little" and that "walking or standing worsens [the] pain." (Tr. 713).  Despite showing "no acute distress," on September 29, 2014, the plaintiff presented to Dr. D'Cunha with spasms in her neck and back that worsened after standing for prolonged times, which interfered with her work. (Tr. 816). Dr. D'Cunha noted further that the plaintiff still had chronic lower back pain and tingling of the limbs. (*Id.*).

Similarly, the plaintiff's physical therapy records indicate that her neck and back condition worsened over time. In her September 26, 2013 general evaluation, the plaintiff presented with lumbar pain that radiated through her legs to her knees, which limited her level of functioning for the past three years. (Tr. 1058). At the time of her evaluation, the plaintiff reported a pain intensity level ranging between six and nine out of ten, with six being the best she would feel. (*Id.*). The plaintiff described the pain as constant burning and aching. (*Id.*). On October 3, 2013, the plaintiff's physical therapist observed an increase in neck and lower back pain that was "severe [the] next day." (Tr. 1100). On October 8, 2013, the physical therapist noted that the plaintiff's neck and back pain persisted. (Tr. 1099). The next day, the plaintiff indicated that, although the exercises were not challenging, they also resulted in an increase of pain. (Tr. 1098, 1095). On October 17, 2013, the plaintiff was unable to do exercises due to lumbar pain. (Tr. 1094). On December 23, 2013, the physical therapist noted that the plaintiff had been seen 16 times, from September 26, 2013 to November 27, 2013, and, despite her goals being "partially met," she still presented with chronic burning in her back and neck. (Tr. 1067). On January 23, 2014, the physical therapist noted that the plaintiff was "reaching [her] max benefit from [physical therapy]" because she was "not progressing further." (Tr. 1071). On February 18, 2014, the physical therapist again noted that the plaintiff was not progressing towards her goals. (Tr. 1070).

On October 29, 2014, Dr. Walker met with the plaintiff following her receipt of an epidural steroid injection. (Tr. 731). Dr. Walker noted that the plaintiff received temporary pain relief of four weeks. (*Id.*). Dr. Walker noted further, however, that "[t]he pain [was] not in the same location as it was initially" and that, at the time of his evaluation, the plaintiff reported the pain was an eight out of ten. (*Id.*). The plaintiff also reported that she did not wish to have a repeat injection despite the temporary pain relief. (*Id.*).

36

As a result of her worsening neck and back pain, the plaintiff indicated to her treaters that she wanted to pursue surgery. On December 30, 2014, Dr. Onyiuke evaluated the plaintiff's candidacy for cervical spine surgery. (Tr. 728). Dr. Onyiuke reviewed the plaintiff's MRI scan of her cervical spine from six months prior to his evaluation, which he reported showed "cervical spondylotic disease with a reversal of cervical spine lordosis with an early kyphotic deformity C5 to C7 compatible with her clinical presentation of cervical radiculopathy syndrome." (Tr. 730). Dr. Onyiuke noted further, however, that she was uncertain about the plaintiff's candidacy for surgery because she believed that there were "some psychological overlays that need[ed] to be clarified by her clinical psychologist" and that her primary care physician and pain physician needed to address lowering her dosage of narcotics. (*Id.*).

Notwithstanding increased pain and only temporary relief, the plaintiff continued physical therapy through parts of early 2016 and early 2017. (*See* Tr. 1044-1057, 1105-1145). On December 6, 2017, during a follow up for her chronic neck and back pain, Dr. Chokr noted that the plaintiff did not want to follow up with Yale pain management because the anti-inflammatory drugs and steroid injections did not help enough. (Tr. 1619). Dr. Chokr noted further that Yale neurosurgery did not recommend surgery for the plaintiff because it would "not help with her symptoms and may in fact worsen the pain." (*Id.*).

In light of the aforementioned treatment records, the Court concludes that the ALJ misapprehended the record and failed to consider the substantial evidence when reaching his RFC determination. First, rather than afford controlling weight to the totality of Dr. D'Cunha's medical opinions, the ALJ's decision erroneously cherry-picked certain observations favoring a denial of benefits, such as the plaintiff's ability to jump off of the examining table without difficulty. (Tr. 768, 28). *White v. Berryhill*, No. 3:17-cv-1310 (JCH), 2018 WL 2926284, at *7 (D. Conn. June

11, 2018) (finding ALJ's RFC was not supported by substantial evidence to the extent that he "cherry-picked" portions of medical evidence and failed to explain why he accorded more weight to certain parts of opinions and not others). Dr. D'Cunha's medical observations—such as persistent tingling, numbness, ringing in ears, insomnia, and limited ability to walk stemming from his initial diagnosis of degenerative loss of disc height with a disc bulge—clearly illustrates that the plaintiff's physical condition was poor and continued to deteriorate over the span of his treatment. (Tr. 666, 712-713, 816).

Second, the ALJ failed to provide any substantive reasoning as to his implicit assignment of little weight to Dr. D'Cunha's medical opinions. "Whatever weight the ALJ assigns to the treating physician's opinion, [he] must 'give good reasons in [his] notice of determination or decision for the weight [he gives to the] treating source's medical opinion.' 20 C.F.R. § 404.1527(c)(2)." *Kevin E. v. Comm'r of Soc. Sec.*, 1:19-CV-00593 (EAW), 2021 WL 1100362, at *4 (W.D.N.Y. Mar. 23, 2021) (citations omitted).

Third, Dr. D'Cunha's opinion is consistent with the plaintiff's nontreating and other source opinions, to which the ALJ also failed to assign proper weight. In March 2013, Dr. Patti noted that the plaintiff's "[c]ondition ha[d] been worsening"; in December 2013, Labarbera observed that the plaintiff's pain "[s]everity level [was] a 9" and that "PT made it worse"; in August 2014, Dr. Walker observed that the plaintiff's "problem has worsened" and the "frequency of pain is constant"; and in December 2017, Dr. Chokr noted that the plaintiff was not a candidate for surgery because "it will not help with her symptoms and may in fact worsen the pain," which, notably, had still been chronic to that point. (Tr. 647, 669, 736, 1619). Furthermore, the plaintiff's physical therapy records, which span 2013 to 2017, indicate chronic burning, persistent soreness, and only limited pain relief that eventually plateaued after the first year of treatment. (*See* Tr. 1044-1145).

Although the opinions of physical therapists are not "acceptable medical sources," they are still entitled to "some weight" and should be evaluated in the context of the entire record. *Keaton v. Saul*, No. 3:19-cv-1487 (RMS), 2020 WL 5525614, at *4 (D. Conn. Sept. 15, 2020). Notwithstanding the consistency of their observations, however, the ALJ seemingly chose to afford little weight to all of the plaintiff's treating, nontreating, and other source opinions.

Despite the substantial evidence suggesting that the plaintiff's physical condition precludes her ability to work, the ALJ chose, instead, to assign the most weight to consultative examiner Dr. Reiher, who examined the plaintiff once and observed normal gait, grip strength, and range of motion. Unlike in his analysis of the plaintiff's mental health impairment, the ALJ was selective as to the medical opinions he gave deference to and failed to give good reasons as to his assignment of weight. For example, the ALJ afforded more weight to the plaintiff's ability to demonstrate "normal strength of the upper extremities as well as normal grip strength" than he did the plaintiff's lower back imaging and disc space narrowing at L4-L5. (Tr. 29). In fact, the ALJ never attempted to expand the record on those medical findings, instead choosing erroneously to substitute his own judgment for medical opinion. *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) ("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion."); *see Riccobono v. Saul*, 796 F. App'x. 49, 50 (2d Cir. 2020) (summary order) (finding ALJ erred when she relied heavily on claimant's ability to exercise as justification for denial of benefits without articulating basis for ignoring or rejecting medical opinion).

The ALJ erred by failing to develop the administrative record to better apprehend the medical opinions of Dr. D'Cunha, refusing to assign controlling weight to the medical opinions of Dr. D'Cunha, and not providing "good reasons" as to his assignment of weight. *See Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) ("Where there are gaps in the administrative record

39

or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence." (citation and internal quotation marks omitted)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004) ("[W]e emphasize that under the regulations, *see* 20 C.F.R. § 404.1527(d)(2), the Commissioner is required to provide 'good reasons' for the weight she gives to the treating source's opinion. . . . This requirement greatly assists our review of the Commissioner's decision and 'let[s] claimants understand the disposition of their cases.' . . . We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." (citations omitted)).

Accordingly, the Court remands for further proceedings. The ALJ is instructed on remand to consider the objective medical evidence in the record, to state explicitly his rationale concerning his assignment of weight as to the relevant medical opinions—particularly, the opinion of Dr. D'Cunha—and to develop further the record as to the plaintiff's physical impairments to the extent necessary.

VI.    CONCLUSION

For the reasons stated above, the plaintiff's Motion for Reversal of the Commissioner's decision (Doc. No. 17) is GRANTED in part and DENIED in part, and the defendant's Motion to Affirm (Doc. No. 18) is DENIED. The case is remanded for further proceedings, and the ALJ is instructed to further examine the medical opinions and objective medical evidence in the record concerning the plaintiff's physical condition and, to the extent necessary, further develop the record as to the plaintiff's degenerative disc condition.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 17th day of August, 2021 at New Haven, Connecticut.

_/s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge